UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:09-CR-00144-R

UNITED STATES OF AMERICA                                                PLAINTIFF

v.

ISIAH THOMAS OLIVER                                                      DEFENDANT

## MEMORANDUM AND ORDER

Before the Court is Defendant Isiah Thomas Oliver's ("Oliver") motion to suppress (DN 17). On March 19, 2012, a suppression hearing was held in Louisville, Kentucky. Robert Bonar, AUSA, appeared on behalf of the Government. Patrick J. Bouldin appeared on behalf of Oliver. Alan W. Wernecke, official court reporter, recorded the proceedings.

The Government introduced the testimony of Officer William Pearson III ("Pearson") of the Louisville Metro Police Department ("LPD"). He was the only witness to testify. Subsequent to the hearing, the Government and Oliver submitted briefs on the relevant legal issues (DN 23; DN 24). This motion is now ripe for adjudication. Having considered the testimony, the arguments by the attorneys, and the parties' briefs, the Court makes its ruling below.

## BACKGROUND

Oliver is charged with being a felon in possession of a handgun, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He moves to suppress a handgun found during the search of Marchelle Woodson's vehicle on October 24, 2008, as well as statements he made to police during the search. Oliver argues that exclusion of this evidence is necessary because the police violated the Fourth Amendment when they seized him without reasonable suspicion or probable cause and searched Woodson's car without knowing and voluntary consent.

1

The relevant facts are not in dispute. On October 24, 2008, Detective Michael Brackett of the Louisville Police Department's Airport Interdiction Unit contacted Pearson with a tip he had received. Hearing Transcript ("HT"), DN 18 p. 4, 8, 15. A confidential informant had contacted Brackett and told him that an African-American man named "Sonny" was in possession of four or five ounces of heroin and dealing it from apartment #15 at 1361 South Floyd Street in Louisville ("Apartment"). HT, DN 18 p. 4, 8, 15. Brackett told Pearson that the tip came from someone he had worked with previously but did not offer any specifics on how the informant acquired the knowledge or whether the informant had a reliable track record. HT, DN 18 p. 16. Despite Pearson's unfamiliarity with the informant, he acknowledged that Brackett had provided "sound" information in the past and was a trustworthy officer. HT, DN 18 p. 16. Pearson agreed to look into it.

Immediately after his conversation with Brackett, Pearson started to investigate the Apartment's address on the LPD's computer system. HT, DN 18 p. 4, 7, 15-16. He found information on the address and people linked to the Apartment, including an individual named "Willie Mitchell." HT, DN 18 p. 9. This is an alias that Oliver occasionally uses. The entry in the system included a mug shot of Oliver, which Pearson printed out. HT, DN 18 p. 9. Although Oliver's mug shot was in the system and the indictment shows he has an arrest record, Pearson did not articulate at the hearing what criminal offenses he knew Oliver had committed before their encounter.

After completing his search, Pearson traveled to the Apartment with several other officers to set up surveillance. Pearson and Detective Jimmy Adams took up a position across the street in an unmarked police cruiser. From their vantage point, they could observe the Apartment's

entrance. Two other officers waited in an unmarked police cruiser down the street to provide assistance if it became necessary.

After watching the building for thirty to forty minutes, an African American man and woman emerged from the Apartment. HT, DN 18 p. 16. The woman was carrying an infant and the man was carrying a large baby bag. The couple descended the stairs from the residence and started to toward a Pontiac Grand Prix parked nearby. Pearson and Adams exited their vehicle and approached the man and woman with the intention of asking for consent to search the Pontiac and apartment. Pearson did not recognize the man as Oliver from across the street, but as he drew closer, Pearson could tell the suspect resembled Oliver's photograph. HT, DN 18 p. 4, 8, 18-19. By the time Pearson and Adams reached the couple, they were in the Pontiac preparing to drive away. Pearson radioed the other officers to pull around and park in front of the Pontiac to prevent the couple from leaving the area. The other cruiser moved into position with its blue lights activated. HT, DN 18 p. 5, 6, 20-21.

With the other police cruiser blocking the middle of the road, Pearson and Adams began to speak with the man and woman. HT, DN 18 p. 10-11, 22-24. The woman, Marchelle Woodson, was in the driver's seat, Oliver was in the passenger seat, and the infant was in the backseat. Adams asked Oliver to step out of the vehicle and to speak with him on the sidewalk. HT, DN 18 p. 24. Oliver obliged without incident. Concurrently, Pearson spoke with Woodson, informed her of the investigation, and asked for consent to search the Pontiac and the Apartment. After a five-to-ten-minute discussion, Woodson assented to the request and signed a "Consent to Search" form. Oliver was not asked for consent to the search the vehicle or the Apartment.

Pearson began his search of the Pontiac at the trunk. After a few moments of examining its contents, Pearson found a pistol. HT, DN 18 p. 12-13. This discovery prompted Pearson to

3

tell Adams that he had located a weapon. Adams was still speaking with Oliver on the sidewalk roughly ten feet away. HT, DN 18 p. 12-13. Pearson testified that though the comment was directed to Adams, Oliver responded with "She doesn't know anything about that; it's mine." HT, DN 18 p. 12-13. The officers then placed Oliver in handcuffs for safety purposes but did not arrest him. After he was restrained, the officers did not question him. Sometime later, the officers ran the serial numbers on the pistol and learned it was stolen.

## DISCUSSION

The Court analyzes three aspects of the parties' arguments to determine the propriety of this motion: (1) if Oliver has standing to challenge the search of the vehicle, (2) whether Oliver's encounter with the police was consensual, and (3) if the seizure was non-consensual, was it supported by reasonable suspicion? Each is discussed in turn below.

### A. **Standing to challenge search of Pontiac**

The Fourth Amendment was established to protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV; *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "[It] protects people, not places, and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson,* 495 U.S. 91, 96 n. 5 (1990) (citation omitted). "[The] capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143 (1978). It is axiomatic that the defendant bears the burden to show a privacy interest in the place searched. *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005).

Passengers in vehicles generally do not have an expectation of privacy in a vehicle and, as a result, are without standing to challenge the vehicle's search. *Rakas,* 439 U.S. at 148-49; *United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008). Nonetheless, a passenger in a vehicle may challenge the constitutionality of a detention and move to suppress the evidentiary fruits of the detention. *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) ("Although a passenger does not have a legitimate expectation of privacy in the searched vehicle, 'as a passenger a defendant may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.'" (quoting *United States v. Jones,* 374 F. Supp. 2d 143, 154 (D.D.C. 2005))).

In *United States v. Ellis*, 497 F.3d 606 (6th Cir. 2007), the Sixth Circuit found that a passenger in a vehicle could not challenge the driver's consent to search that vehicle. Following a traffic stop, the police officer separated the driver from the passenger and spoke privately with the driver. *Id*. at 612. The officer asked the driver for permission to search the vehicle and was granted consent. *Id*. In the subsequent search, the officers discovered a quantity of cocaine. *Id*. The appeals court upheld the district court's decision that while the passenger had no standing to challenge the driver's consent to the search, he could contest the constitutionality of the traffic stop and the evidence that "flowed from the search and seizure." *Id*.

Oliver's circumstances are sufficiently similar. No evidence was offered to show Oliver had a property or possessory interest in the Pontiac. It is therefore doubtful that he had a reasonable expectation of privacy in its trunk. Accordingly, he may not challenge whether the officers breached protocol when they obtained consent from Woodson to search the vehicle. Rather, his only avenue to contest the search is to challenge the constitutionality of his stop and seizure while inside the Pontiac.

### B. Consensual encounter or *Terry* seizure

Besides unreasonable searches of places, the Fourth Amendment protects citizens from unlawful seizures. A seizure occurs where an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement '*through means intentionally applied.*'" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis in original) (citations omitted).

Not all encounters with the police implicate a citizen's rights under the Fourth Amendment. Permissible interactions between the police and citizens are grouped into three categories: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (quoting *United States v. Waldon,* 206 F.3d 597, 602 (6th Cir. 2000)). Investigative detentions are seizures pursuant to *Terry* and require adherence to the principles of the Fourth Amendment. *Smoak v. Hall*, 460 F.3d 768, 780-81 (6th Cir. 2006) (citations omitted).

Oliver argues the police's actions were constitutionally impermissible because when they prevented Woodson from driving away, they lacked reasonable suspicion as required by *Terry*. He continues, stating that his detention outside the vehicle ripened into an arrest for which there was no probable cause. The Government counters that the interaction between the participants was consensual and does not implicate the Fourth Amendment. Alternatively, the Government insists the detention was supported by reasonable suspicion in accordance with *Terry*.

6

No suspicion of criminal activity is necessary for a consensual encounter between the police and the citizenry. The police are permitted to approach individuals, ask questions, and request for consent to search. *United States v. Russ*, 772 F. Supp. 2d 880, 886-87 (N.D. Ohio 2011) (citations omitted). So long as the subject being questioned would feel free to terminate the conversation and "go about his business," the Fourth Amendment's protections are inapplicable. *Florida v. Bostick,* 501 U.S. 429, 434 (1991). "Factors that, if present, indicate that a seizure occurred include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *United States v. Mendenhall,* 446 U.S. 554 (1980)).

Oliver stresses that the police's show of force, specifically, the approach of the officers on foot and the positioning of the police cruiser in front of the Woodson's vehicle, precludes a finding that the encounter was consensual. The Sixth Circuit recently examined how the placement of a police vehicle can impact an interaction between a citizen and officer. In *United States v. Carr*, 674 F.3d 570 (6th Cir. 2012), officers in an unmarked police cruiser noticed a vehicle parked at a car wash at night in a high-crime neighborhood. *Id*. at 571. The officers drove into the parking lot and parked approximately twelve feet from the suspect's vehicle. *Id*. at 572. They then flashed their blue lights once to alert the suspect that they were police. *Id*. Upon approaching the vehicle, the officers discovered assorted contraband in plain view. After his arrest, the defendant moved to suppress the evidence on the basis that he was seized under *Terry* without reasonable suspicion when the police positioned their cruiser in front of his vehicle. A divided panel of the Sixth Circuit disagreed and ruled that the encounter was consensual. It concluded

7

that the angle of the police vehicle offered ample room for the suspect to maneuver around the police vehicle and drive away. *Id*. at 573. It also found that momentarily flashing the blue lights did not transform the meeting to non-consensual since the police officers were merely using the device to broadcast their identity. *Id*.

Marked differences exist between *Carr* and the present matter. Though Pearson does not recall the precise location of the police cruiser relative to Woodson's vehicle, he indicated the purpose for radioing the second cruiser was to prevent Woodson and Oliver from leaving the area. As such, it is doubtful Woodson could have manipulated her vehicle past the police cruiser and continued on her way. Unlike *Carr* where the cruiser's blue lights were switched on for a moment, Pearson insinuates that the other officers left the blue lights on for a longer period of time. HT, DN 18 p. 5, 6, 20-21. Moreover, while two officers approaching a vehicle on foot did not present sufficient coercive indicators in *Carr*, the presence of four officers here warrants the opposite conclusion. The number of officers and their locations relative to Woodson's vehicle likens the police's actions to an encirclement of the Pontiac and its occupants. Surrounding a suspect increases the odds that he or she will not feel at liberty to end the encounter. *See United States v. Clements*, 522 F.3d 790, 794-95 (8th Cir. 2008) (consensual interaction between police and suspects in a vehicle where the police did not surround the vehicle with "multiple squad cars or officers or otherwise prevent [the suspects] from driving away"); *Gross*, 662 F.3d at 399-400 (investigative stop occurred when officer parked behind suspect's vehicle, which prevented the defendant from backing out of parking spot).

As no reasonable person would have believed they were free to terminate the encounter, the interaction between Oliver and the officers was not consensual.

8

C. **Supported by reasonable suspicion**

Without the possibility of a consensual encounter, the Court must analyze the constitutionality of the investigative stop. "To justify a brief, investigative stop under *Terry v. Ohio,* 392 U.S. 1, (1968), an officer must point to specific, articulable facts that gave rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity." *Gross*, 662 F.3d at 399. Reasonable suspicion is judged with an eye toward the totality of the circumstances. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). Reasonable suspicion need not rise to the level of probable cause, but the detention of an individual must be based on more than a "hunch." *Terry*, 392 U.S. at 27. "It is the Government's burden to demonstrate that a stop based on reasonable suspicion satisfies the conditions of an investigative *Terry* stop." *United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (citation omitted).

The officers did not observe Oliver or Woodson engage in any criminal activity when they exited the apartment and entered the Pontiac. Therefore, the underpinning for the reasonable-suspicion argument is relegated to the informant's tip and Pearson's investigation. Tips from informants may provide the reasonable suspicion for an investigative stop, but a distinction exists between tips from anonymous informants and informants already known to the police. A purely anonymous tip that a person of a certain description has committed a crime, without more, is incapable of forming reasonable suspicion for an investigative stop. *See Florida v. J.L.*, 529 U.S. 266 (2000); *Alabama v. White*, 496 U.S. 325 (1990). Such anonymous tips offer no basis to measure the informant's reliability and lack predictive information that would allow the police to test the informant's knowledge. *J.L.*, 529 U.S. at 270. Where the police have previously worked with the informant, the court may consider "the identity and reliability of an informant when assessing whether an officer possessed reasonable suspicion for a stop." *Bazzi v.*

*City of Dearborn*, 658 F.3d 598, 607 (6th Cir. 2011). Likewise, "[t]ips that provide specific details or predictions of future action fall higher on the reliability scale because they suggest the existence of knowledge to which the public might not have access." *United States v. Williams*, No. 11–1476, 2012 WL 1700454, at *4 (6th Cir. May 15, 2012) (citing *White,* 496 U.S. at 332). The dispositive inquiry is whether the tip provides a sufficient indicia of reliability to create reasonable suspicion of criminal activity. *United States v. Cortez,* 449 U.S. 411, 417-18 (1981).

The initial hurdle for the Government is Pearson's unfamiliarity with the informant. While Brackett vouched for the informant's reliability, Pearson did not personally know the informant or his prior track record. The question thereby becomes whether the reliability of an informant can be imputed between officers in the same police department or if the Court should treat the tip as an anonymous communique? Other courts ordinarily credit the experience an officer has with an informant to other officers participating in an investigation. *See United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010) (knowledge of dispatcher was attributed to officers in the field effectuating the arrest); *United States v. Adams*, No. 1:09-CR-00159, 2010 WL 481074, at *2 (M.D. Pa. Feb. 4, 2010) (tips from informant to normal contact imputed to arresting officer); *United States v. Pierce*, No. 06-CR-42-DLI, 2007 WL 1175071, at *4 (E.D.N.Y. Apr. 19, 2007) (court imputed the reliability of informant between the officer that knew the informant and the officer relying on the tip). Despite the relay of information from Brackett to Pearson, the tip should be evaluated as originating from a known source that had worked with the LPD in the past.

Notwithstanding this finding, there is cause for concern with both the shortage of specifics on the informant and the absence of verifiable information in the tip itself. "Typically, courts have found reasonable suspicion for a stop only when the police know the tipster to be reliable or when the tip contains independently verifiable details showing knowledge." *Northrop v.*

*Trippett*, 265 F.3d 372, 381 (6th Cir. 2001) (citations omitted). Even if the tip came from a known informant, the Government has not introduced any information on the informant's reliability and past dealings with the Brackett. How long did Brackett know and work with the informant? Had the informant worked on narcotics cases in the past? How accurate was his past information? These questions remain unanswered. Further, the Court is without details on how the informant came to possess this knowledge and his motivation for turning it over to Brackett. Did the informant know or witness Sonny selling drugs out of the apartment? Was the informant told second hand about the heroin? Did the informant have a score to settle with Sonny or was this an altruistic gesture of a law-abiding citizen? The difficulty of weighing these factors during the reasonable-suspicion analysis discounts the effect of the tip. *See United States v. Martinez*, 486 F.3d 855, 862 (5th Cir. 2007) (where no direct evidence was introduced on the informant's reliability, the government failed to carry its burden of showing reasonable suspicion).

Nor did the tip contain verifiable details to test the informant's knowledge. Brackett passed along that an African-American man named "Sonny" was dealing drugs out of the apartment. The tip did not include a physical description of "Sonny" other than his race. There was no reference to Oliver or "Willie Mitchell." The informant did not mention that Sonny would be with a woman and infant or carrying a baby bag. The tip did not predict that Sonny would leave the apartment and drive away or that he would be moving contraband from the apartment. Courts defer to the reasonable-suspicion decisions by officers where they have matched the predictions of the informant to their on-the-scene observations. *See, e.g.*, *White*, 496 U.S. at 327 (reasonable suspicion to stop existed where informant predicated and the police observed a woman leave an apartment at a particular time, enter specific car, and drive to a specific hotel); *United States v. Ammons*, 419 F. App'x 550, 555 (6th Cir. 2011) (police had reasonable suspicion to stop

11

truck where the informant told police the defendant would be towing stolen trailer and police observed such behavior the next day); *United States v. Taylor,* 162 F.3d 12, 19-20 (1st Cir. 1998) (reasonable suspicion to stop suspect's car when the a known informant offered specifics on make and model of a car, a description of the occupants, and the area where drugs would be delivered). Here, the officers were without any information that they could verify to assure themselves the informant knew what he was talking about.[1] *See United States v. Jackson*, 328 F. App'x 933, 936-37 (5th Cir. 2009) (where surveillance of defendant did not corroborate informant's information, the tip did provide reasonable suspicion to detain).

  The Government premises its reasonable-suspicion argument on two facts. The first is Oliver's connection to the Apartment. According to the Government, the discovery of Oliver's photograph removes anonymity from the equation. It declares that Oliver was not just any person coming out of the apartment - he was an individual known to be associated with the residence in the informant's tip. Since Pearson recognized Oliver after exiting the apartment, the Government contends an investigatory stop was permissible.

  The presence of the photograph is not the silver bullet the Government makes it out to be. At the suppression hearing, the Government did not explain how Oliver was associated with the apartment. HT, DN 18 p. 10. Since the officers never broached the subject of the consent with Oliver, it is safe to assume he did not live in the apartment. Such a conclusion begets more unanswered questions. Was Oliver listed as a past resident of the apartment? Did his connection arise out of his criminal record or was it from a more benign source such as a past driver's license?

---

1 And, in reality, the informant did not know what he was talking about. Pearson acknowledged that the officers never found any heroin in the Apartment. HT, DN 18 p. 17. The officers did find "a few grams of cocaine." HT, DN 18 p. 17.

12

Without this information, Oliver's connection to the apartment is unknown and the utility of the photograph is substantially reduced.

In addition, the effect of the photograph is undercut because the tip referred to "Sonny" and not Oliver or Woodson. Pearson's testimony suggests that when he investigated the apartment on the LPD computer system, there was no correlation between "Willie Mitchell" and the alias "Sonny." When deciding whether to stop Oliver, Pearson never said he thought Oliver was Sonny; he simply recognized Oliver from the picture that he had downloaded. HT, DN 18 p. 18. Thus, Oliver was stopped not because he was suspected of selling heroin but because he was affiliated with and exiting from a residence where drugs were believed to be. Investigative stops have been found unconstitutional where their sole foundation was the detainee's presence in the vicinity of criminal activity or a high-crime area. *See*, *e.g.*, *United States v. Cohen,* 481 F.3d 896 (6th Cir. 2007) (reasonable suspicion for investigatory stop did not exist when police stopped defendant's vehicle when coming out of a cul-de-sac four minutes after a house on the road called 911 and hung up); *United States v. Patterson*, 340 F.3d 368, 369-70 (6th Cir. 2003) (investigative stop lacked reasonable suspicion where police stopped defendant walking away from drug corner after citizen complained men were selling drugs near that location). When investigatory detentions of individuals coming and going from suspected drug houses are constitutionally condoned, more compelling evidence exists about the detainee's connection to the residence or the illegal activity. *See*, *e.g.*, *United States v. Burton*, 441 F.3d 509 (7th Cir. 2006) (police had reasonable suspicion to stop defendant when he stopped in front of house under surveillance for drugs, briefly spoke with a man who emerged from the house, and the man leaned through the window of the car); *United States v. Robinson*, 119 F.3d 663 (8th Cir. 1997) (officers had reasonable suspicion to stop defendant when they knew he had been convicted of drug crimes in

the past, saw him approach the house where drugs were believed to be, and informant had recently made drug purchases at that location). The photograph Pearson found may demonstrate Oliver's association to the apartment, but it falls short of establishing a firm nexus between him and the criminal activity in the tip.

Second, the Government belabors Oliver's "history with the criminal justice system." Gov't Brief, DN 23 p. 8. Although a detainee's criminal history standing alone is insufficient to justify an investigative stop, *e.g.*, *United States v. Andrews*, 600 F.2d 563, 567 n. 5 (6th Cir. 1979), it may be relevant in establishing reasonable suspicion. *E.g.*, *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). The officers who conduct the stop must have known about the criminal record beforehand if it is to be weighed as a factor for the investigatory detention. *See United States v. Robinson*, 149 F.3d 1185, at *5 (6th Cir. 1998) (table). Pearson did not specify what criminal convictions Oliver had been subjected and whether he knew of Oliver's past drug conviction when the officers approached him outside the apartment. In fact, at no time during the suppression hearing did Pearson expressly state that he knew Oliver was a criminal at the time of the stop. Perhaps the presence of Oliver's mug shot in the police database alongside a criminal conviction for drug possession could create the reasonable suspicion necessary to justify the investigatory stop. *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (reasonable suspicion for an investigative stop may be premised in part of criminal record of the suspect). However, Pearson did not offer testimony of this nature. Oliver's criminal history is inconsequential because the Court cannot guess, speculate, or infer what offenses Pearson knew of when he detained Oliver.

Even though the suspicion level necessary for an investigative stop is minimal, the Government has not shown there was reasonable suspicion to believe Oliver and Woodson were

engaged in criminal activity. The Government failed to offer any background on the informant. The tip lacked verifiable information for the officers. No specifics were offered on Oliver's connection to the apartment. The Government did not elicit statements from Pearson explaining what he knew about the Oliver's criminal record before the detention. Taken in the aggregate, the Government failed to carry its burden and prove the police acted with reasonable suspicion.[2]

### D. **Impact of the illegal stop**

If a stop under the Fourth Amendment is illegal, the Court must then consider whether the fruits of the stop – here the pistol found in the trunk and Oliver's statement to the police – should be suppressed under the exclusionary rule. In *United States v. Gross*, the Sixth Circuit provided the framework for crafting an appropriate remedy for an unconstitutional detention:

> The animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior. The Supreme Court has declined to adopt a "*per se,*" or "but for," rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest. Rather, the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. . . . [T]he relevant question is whether each piece of evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. Accordingly, we must consider whether the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the "taint" imposed upon the evidence by the original illegality. In doing so, we consider all relevant factors such as the length of time between the illegal seizure and the discovery of evidence or the confession, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his *Miranda* rights before he confessed. No single factor in this analysis, however, is dispositive of attenuation.

662 F.3d at 401-02 (citations and quotation marks omitted).

---

2. The Court finds that the stop of Oliver and Woodson did not ripen into an arrest until after the gun was located. In measuring whether an investigative detention mutates into an arrest, courts review "the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is 'reasonably related to the basis for the original intrusion.'" *Smoak*, 460 F.3d at 780-81 (quoting *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999)). The interaction between Pearson, Adams, and Oliver was not so confrontational to trigger the probable-cause standard. However, since the investigatory stop was not supported by reasonable suspicion, such a finding is unnecessary to suppress the weapon and the statement.

In the instant matter, the stop by the police, the search of the vehicle's trunk, the discovery of pistol, and Oliver's statement all occurred within a matter of minutes. This quick succession of events makes it impossible to carve out the illegal stop by the officers from the discovery of the weapon and Oliver's remark. In *United States v. See*, 574 F.3d 309 (6th Cir. 2009), the Sixth Circuit examined whether the police acted without reasonable suspicion when an officer parked his cruiser behind the defendant's parked vehicle and prevented him from driving away. *Id*. at 312-14. After ruling the detention was without reasonable suspicion, the appeals court suppressed the firearm and bullets discovered in the defendant's vehicle because they were a "direct result of the initial, unlawful *Terry* stop." *Id*. at 314-15. For the purposes of the exclusionary rule, *See* is indistinguishable. The weapon Pearson discovered and Oliver's remark would not have occurred without the illegal detention.

During the suppression hearing and in the subsequent briefing, the parties did not examine whether the pistol and Oliver's inculpatory statements would be admissible through the inevitable-discovery doctrine or the independent-source rule. The Court extended the briefing schedule to allow the parties the opportunity to address their applicability. DN 26. The Government informed the Court that it would forgo the opportunity and rest on its previous arguments.

Despite its best efforts, the Court cannot conceive of a scenario whereby the police would have gathered this inculpatory evidence through the inevitable-discovery doctrine or the independent-source rule. *See id*. As the Government bears the burden to prove the appropriateness of these doctrines, its silence forecloses their application. *See United States v.*

*Fofana*, 666 F.3d 985, 992 n. 1 (6th Cir. 2012).  Judging from the clear implications of the evidence, the pistol and Oliver's statement are unaffected by either of these legal rules.

## CONCLUSION

Simply stated, the Government has failed to reach its burden on a number of key issues. For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's motion to suppress (DN 17) is GRANTED.